Please. The court is adjourned. Our next case is 16-16462, the estate of Juanita Jackson et al. v. Rubin Schron. Mr. Wilks. May it please the court. My name is Jim Wilks. In the last era, we represent the appellants. There are actually six states that are involved here. There's the Jackson estate, the Townsend estate, the Webb estate, the Sasser-Nunziata-Jones. This is a case that has two issues. One issue has to do with a permanent injunction that was issued by the bankruptcy court. And joining all of the states from any actions that would arise out of any nucleus of facts that had been determined by the bankruptcy court with any motions to dismiss or any trial regarding a March 2006 transaction and a January 2012 agreement with a Maryland state court receiver. The second issue is a motion to dismiss that was granted. And the question there is whether first there was jurisdiction to order the process complaint be filed in front of the bankruptcy court. And the second issue is whether the procedure in granting the motion to dismiss was proper. Mr. Wilks, can I ask you a question? Yes. If, and you need to assume this for purposes of my question, although I'm not sure that it's right, but you need to assume this. If the district court correctly dismissed the estate's claims against Mr. Schramm with prejudice, does the other issue go away?  First of all, the district court didn't dismiss it. The district court did not hear the case. The district court affirmed the dismissal by the bankruptcy court, did it not? There was an appeal. No, it did not. Well, it should have happened. Well, if the district court affirmed, if there was an appeal and the district court affirmed, then that's why you're here, right? Well, no. If there's no court jurisdiction and there's no non-court jurisdiction, then the bankruptcy court can't hear the case in the first instance. No, no. If there's non-court. Okay. The district court had jurisdiction over your complaint, did it not? The bankruptcy court had jurisdiction over your complaint, did it not? Yes. Okay. The bankruptcy court . . . No, the bankruptcy court did not have jurisdiction over it. The bankruptcy court ordered us to bring it. We were proceeding in state court and federal court proceedings. This court in Jackson v. Schramm, GE v. Schramm, excuse me, Jackson v. GE at Schramm, was a proceeding supplemental that had been brought to state court. It was removed to the district court, to Judge Covington, I believe, and the initial motion to remand was denied. Thereafter, and this summary comes from the Jackson case . . . So, if you had prevailed in this case, if you had prevailed in this case all the way through judgment and gotten all the relief you wanted against Mr. Schramm, you would have confessed that the judgment had to be set aside for lack of subject matter jurisdiction? No. Then the bankruptcy court had jurisdiction? No. I don't think that if we had prevailed in the bankruptcy court . . . I was talking about the original proceeding. I'm talking about the complaint that we are discussing in this appeal. I think . . . This is the . . . Okay. You had a complaint that included . . . The estates had a complaint that included claims against Mr. Schramm, right? Yes. That's the complaint that was dismissed by the bankruptcy court with prejudice, right? Yes. You appealed . . . Yes. Raising a number of issues. The district court affirms that dismissal, right? Yes. Okay. My question to you is this. If that dismissal is affirmed here, in other words, if that dismissal is correct, and I'm asking you to assume that, does the other issue about the injunction go away? No. Okay. Tell me why not. In other words, if you have a binding judgment against you that would serve as res judicata in any further proceeding against Mr. Schramm, why is an injunction inappropriate? First of all, the anti-injunction laws state that courts cannot enjoin a state court. In this case, it enjoined both state courts and it enjoined district courts, other district courts. It did something that was somewhat unusual. I think that term for it is raris obvis, which is rarest ever, and I don't know of another instance of it in the 11th. But we still would be allowed to bring our state court claims. Normally, in a bankruptcy, I'm sorry, go ahead. Why? Because one of the exceptions to the anti-injunction statute is if the injunction is necessary to protect or effectuate a court's judgment. Isn't this the paradigm example where a judgment has been entered by the bankruptcy court and you would be trying to get around that by going to state court and relitigate the underlying claim? No. No. In this case, we started in the state court and there were many defendants. Tell me why you say why not. You've got a judgment, Mr. Schramm, it's home free, dismissed with prejudice. You want to go to another state court and say let's litigate this same thing against Mr. Schramm. Isn't that clearly? We're not doing the same things. I mean, there's a Walter case in January of this year that came out and it spoke to where a bankruptcy court, it actually dealt with direct appeal from the bankruptcy court to this court. It said there's a process. There's jurisdiction, either core or non-core, or no jurisdiction. And if there's no jurisdiction, then the bankruptcy's judgment. Forget the jurisdiction part. I mean, this is just, you don't even have to be a lawyer to understand this, I don't think. He wins in the bankruptcy court. You want to go to another court and relitigate. The rule is you don't get to relitigate something he's won in a court. We didn't go to the bankruptcy court to litigate the same issues. We have multiple issues that were not, when we first filed the complaint, the judge said you may not file and I have no jurisdiction over your proceeding supplementary, which this court had heard in the Jackson case. He said I don't have jurisdiction over the proceeding supplementary in the state court. He said I do not have jurisdiction. You're back to what Judge Jordan asked you. You're back to jurisdictional argument. Judge Jordan, the premise of his question, though, was leaving jurisdiction aside. Would your issue go away with injunction? And is your answer yes, it would go away because your only defense is jurisdictional? We filed a claim in bankruptcy court in Voluntary 7. The judge said I want to decide all collateral issues involving all parties and I want you to file a complaint here and bring every claim you can think of that would fall under bankruptcy jurisdiction in here. And that was done by order without option. And we did not file all the state court claims. Many of these claims weren't right. At the time that the order was given in September 13, Townsend had been tried. Webb had been tried. Nunziata had been tried. Jackson had been tried. Sasser and Jones had not been tried. Webb had been overturned on appeal. Nunziata was on appeal. What are these new and different claims? There seemed to me to be an overlap between what you'd like to go forward with and what was tried. What are these new and different claims that you were bringing? What are the other claims? What's the nature of them that is different from what you did in the bankruptcy court? Examples of claims that we didn't bring. Florida Deceptive Trade Practices Act. Florida racketeering. Federal racketeering. 1983 actions. But they're all based on the same underlying acts, correct? Say again? They're all based on the same underlying acts by Mr. Sean, correct? The law is clear that the relitigation exception, even if the facts are similar or if they're overlapping, does not bar the state court claims. It's very narrowly construed. The Anti-Injunction Act, if there's a question, if there's a doubt, if there's any question on whether you're litigating the same thing, the answer is easy according to this court, is you don't support the injunction. Your argument is that Mr. Sean would then have to raise arrest judicata bar in the state court proceedings and you'd have to litigate it there. Yes, and that's exactly what this court has said. There's no dispute on that. There's not any question that that's what has to happen. In this case, instead, this injunction was done. There was no complaint filed for an injunction. There's no request. There's no description of which order was protected. Well, that last part is pretty clear. Whether it's valid or not, it was protecting the judgment, dismissing your complaint with prejudice. That's what the point of raised judicata, collateral estoppel, judicial – that's the point and that's what the courts have said over and over again. You can't take something in bankruptcy. But I'm going to go back to Walter real quickly. If there's no jurisdiction, there's no jurisdiction. I understand that – You mean that – okay. I'm talking about – You're telling – There's an issue here. Okay. He should have done findings of fact and conclusions of law on the motion to dismiss and sent that to the district court and not issued a final judgment. Are you relying on the Anti-Injunction Act? No, I'm relying upon this court's decision in Walter's case in January of this year that said that a bankruptcy court who doesn't have jurisdiction has to issue findings of fact, conclusions of law, send those to the district court, and the court then makes that decision. But their first – and that gives you an opportunity to determine was there jurisdiction to take the case in the first instance. That's the most recent case I can find on the issue. But that was not – no, no. Say again. That case – was that the case I wrote? Yes. Okay. Then if I recall it correctly, that case didn't say that the bankruptcy court lacked jurisdiction. It said that – excuse me, the bankruptcy court lacked jurisdiction to enter a final judgment and proceed to final judgment. Yes. And that's where it has to enter findings and conclusions. Yes. And then send those to the district court. Absolutely. And that's the situation here. I don't think anybody can argue this was a court proceeding. But your argument in the brief is not that the bankruptcy court lacked jurisdiction to go to final judgment, but that the bankruptcy court lacked jurisdiction at all. Which of the two is it? The bankruptcy court lacked jurisdiction over most of the things that were conflated. There was a conflation here. Judge Williamson made comments. He said that these cases were going to be brought together because it was in public interest. Well, public interest at Oxford has to do with public agencies. There's even an argument the government agency has to be involved. He talks about balancing inefficiencies. Stern addressed that very clearly and said that because it's efficient or because somehow it makes the process work easier, that doesn't trump the Constitution. In this case, there was a debtor that was, at the time, difficult to find and determine who they were. And April of 2012, the bankruptcy was filed in November of 2011. Soon thereafter, there was a default entered. The trustee was appointed. In one or two sentences, why do you say there was no jurisdiction? Say again? In one or two sentences, shorthand, why do you think there was no jurisdiction? Because this did not arise in or from the bankruptcy and was not related to. These actions are all independent. The Townsend case, for instance, is so far independent, the bankruptcy judge said it was independent. But you weren't seeking any relief that could have affected the bankruptcy estate of the debtor? No, no. What should have happened is when the judge said on April 12, 2012, when there was a request by an attorney, as the judge said, who parachuted in with $200,000 into the estate that had no assets and they could not even find a person to speak for it, he said, if you came in here and tried to convert this to a Chapter 11, I would dismiss it for bad faith. Knowing what I know now. And this was when we were at the very beginning of the process. So we can't even find out who the actual representative is. He said, so for you to come here and ask me to convert it, I can't do that. What should have happened is when he found out that the man that owned this company didn't own it, had been given the stock by Mr. Schroen's representatives out of Mr. Schroen's account, two $2,000 payments in a paper bag, a man who lived in a basement with poor hygiene, who according to Mr. Schroen's attorney did not understand what he was doing. When that man was given the stock of this company in order to dump assets, to complete a very massive venture, because previously it encompassed two separate nursing home chains across the United States. At that point, what should have happened, the involuntary settlement should have been dismissed. Now, there were attempts to move this. Not because there was a lack of jurisdiction, but because a bad faith dismissal was appropriate? Because there was nothing left to adjudicate. The state had nothing. They had no corporate books. That happens all the time and people decide for whatever reason to pursue judgments. Now, usually a trustee steps in and says, hey, if there's nothing to recover at all, we're not going to go forward. But if we think we can pursue adversary proceedings, fraudulent transfer proceedings, we're going to go ahead and we're going to try to recover money for the estate for the benefit of creditors. This case, the creditors in part are your clients, are they not? This case, we had clients who had claims against people who had nothing to do with this debtor. The Townsend case, and that's one of the reasons you gave us extra time. The Townsend case was tried in the summer of 2013. And Judge Williamson, the bankruptcy court judge, had a hearing on the Friday before. But your claims, Mr. Wilkes, we're trying really hard to understand this very difficult and complex case. And at least I'm having trouble following your linear argument. You were suing because you got judgments against the corporate defendants for the wrongful debts, right? And then we implanted and added in FLTCI. But you got judgments against most, if not all, of those entities. You had judgments in your hand, right? No, we had one judge against FLTCI. How many judgments did you ultimately get outside of the bankruptcy court proceeding? The so-called empty chair proceedings as they're referred to by some. They were defended for six years by three different law firms. The empty chair defense was a strategic move and so named it by the court. But the judgments we got, we had a judgment initially. And all the cases have settled at this point if the settlements are sustained and nobody's objected. So I assume there's judgments in all the cases right now. But as far as trial judgments, we got a trial judgment in the Jackson case. We got a trial judgment in the Nunziata case. We got a trial judgment in Webb which was reversed on appeal. We got a trial judgment in Townsend which was appealed and sent back to the state court. The judge removed it and then decided it on its merits even though it had nothing to do with the debtor. Okay, but you got a number of judgments against at least some of the corporate entities for the wrongful debts, right? Yes. Okay. When the suits that were that you intended to file and did file in bankruptcy court, whether you were compelled by the bankruptcy court or not, all of those were for people who you say had assisted the corporate entities in divesting themselves of assets to make them essentially judgment-proof. Did you not? Wasn't that the theory of the claims? It was. If one had to put them in shorthand? In the beginning, it was the theory, but the facts developed. We didn't get discovery in this case. Okay, hold on, hold on. If that's the general theory of why you were suing these other people, that they had assisted in some scheme to allow the corporate entities to sort of divest themselves of assets, make them judgment-proof and transfer assets in a fraudulent manner, how could that not be related to the bankruptcy estate of the debtor? The debtor didn't exist. It was a fake dummy corporation that was given to somebody. It doesn't matter. You got a judgment against that fake dummy debtor, right? You pursued that fake dummy debtor. But we got it when we didn't know that it was a fake. We didn't know the facts at the time. We had been given. That was part of the deceit in this case. These cases were prosecuted. These involved six people that suffered horrible outcomes. We've been litigating since 2004. Nobody disputes that. And this court, this very court, found that in the Jackson case, the R.M. Cleter motion was so clear that it created an independent cause of action. I would encourage you to read the facts in Jackson. It said that for the first time, a case would go back to the state court. It was an absentia doctrine remand. They said it was not the appropriate remedy and said it's going to go back to the federal court. I mean, excuse me, under state law, under 5629, and that action will proceed. And that action, by the bankruptcy court's own admission, was not under his jurisdiction. By the time this injunction came around, he entered it. They never asked for an injunction. There was never a pleading for an injunction. But did you not have an opportunity to make every claim, I mean, before Judge Williamson in the bankruptcy court? No, we had none. No, we did not. That's the problem. We did not. You filed two very extensively lengthy complaints. We did, but we didn't have a chance to make every claim. What were you prohibited from claiming? We were prohibited from claiming the fraud on giving the money and cash that came in. We found that out about six weeks, eight weeks before trial, and the judge wouldn't let us claim it. You weren't prohibited. You just didn't know about it. You weren't prohibited from making any claim. You just later learned facts that you wish you had put in the original complaint. No, we didn't know it. They had hid it. They had lied. They had committed a fraud on the court. And the trustee was both ordered to be our co-counsel and was ordered to defend the cases. This case, there's never been a case like it. The trustee made $10 million on this case. I mean, there's never been a case that I've ever been involved in in my life that is a greater injustice than this. And part of the fact is the court ordered the defense cost turned over. $24 million was spent in one year defending this case. From 2013 to 2014. Let me ask you one thing, Your Honor. Hold on, hold on. You talk about the numbers. How much were you seeking? The bankruptcy court, we were seeking How much did you want to get from Mr. Schrond? Every cent available to satisfy all the judgments you had gotten. In equity, what I'd like to get would be the $2 billion that he stole. Okay, well, if you We should be entitled to bring that claim, but he stole $2 billion. If you're talking about, in today's dollars, spending $10 million to defend a $2 billion lawsuit, the numbers don't seem all that out of whack. When you're suing somebody for $2 billion, then they're like, Well, okay, maybe $10 million is worthwhile defending. Your Honor, there was no defendant. The debtor was an old man who was abused. We couldn't even bring that exploitation claim. Well, this settlement that What was your Let me take you over a little bit to this role. The settlement, which I'm sure we'll talk about when you're posing counsel. You all were involved in agreeing to part of the settlement, or no? What was your role in this settlement? What was your position with the settlement that ultimately occurred? With all the other parties? Yes. We ended up settling first with Fundamental, then with everybody. GE, Ventosh, GTCR. I can't remember who else, but the Fundamental You're okay with the settlement terms. The part of the settlement you're not okay with is that part that says this settlement depends on this injunction being issued. You're not agreeing with that part of the settlement. We went up on appeal. Right now I don't want the history. Just yes or no. You're okay with every part of the settlement, except the one part you're not okay with is the part that's then joining you from bringing further actions against Schron. Is that your position? Yes. We're okay, except for the language of the order that Judge Williamson wrote on the judgments, that they're not necessarily judgments. But other than that, yes. The monies that were So, if you're okay with the settlement, that means you want to go forward against Mr. Schron elsewhere, but you're also okay with the part that dismisses him? If you're settling, you're okay with the part that dismissed the claims before the bankruptcy court? No, we are not. In fact, we specifically excluded those. And we got all the parties to agree to give up the borrower order, which initially had been asked, and everybody gave up the borrower. He was a non-contributing, non-debtor. This Court had held that you can't give a borrower in that situation. So, instead, the judge gave an injunction. He wasn't a party to the settlement, right? No, he refused to be. He would not settle. All right. Thank you very much. Mr. Wilkes will give you your full chance for rebuttal. Mr. Engle. May it please the Court. Steven Engle here from Deckard, LLP, with me is my colleague, Catherine Wyman. So, a lot of issues in this case. There is a great injustice in this case, although I may disagree with Mr. Wilkes over where the injustice lies here. If the Court will permit me, I'll give a brief kind of intro. The Bankruptcy Court correctly entered the permanent injunction here. The Bankruptcy Court correctly dismissed all of the claims against Mr. Schroen. This litigation began nearly a decade ago as six ordinary personal injury lawsuits against Florida nursing home companies. After two of those nursing home companies, THI and THMI, defaulted, let's just say they went defunct. They then defaulted. The probated states persuaded the state courts to have jury trials where nobody showed up on the other side. In that environment, they succeeded in turning run-of-the-mill, obviously tragic to the individual situation, but run-of-the-mill personal injury cases into $100 million verdicts. And so they started with $110 million in the first. The second one, they got $200 million. The third, they got $900 million. I can only assume that they had got the formula down for producing these results. Fueled by these gigantic judgments, the probated states then pursued over two dozen parties in a variety of state and federal courts, including the 16 that were at issue in the adversary that wound up in the Bankruptcy Court. Initially, they did this through state court impleter actions. The very first one, General Electric and Mr. Schroen were impleted in the Jackson case. That was removed to federal court. This court addressed the jurisdiction and essentially said that the federal courts can keep the case because the supplemental proceeding is essentially a distinct cause of action in that case. Ultimately, they found the parent of THMI, this FLTCI company, debtor. They put it into bankruptcy. They thought they were running into issues because many defendants, like Mr. Schroen, had nothing to do with Florida, had no business in Florida, so there were very serious and meritorious personal jurisdiction issues with the Florida state courts. They strategically took advantage of the bankruptcy case. They didn't want to stay the proceedings against THMI in the state courts because they liked that environment, but they put FLTCI, the parent, into the bankruptcy, took advantage of the wide-ranging authority  from many other parties, including Mr. Schroen. Now, Mr. Schroen is a 79-year-old real estate investor. Of the 16 parties, he's the one with the least to do with any of these THI, THMI. He's never been in privity with either of those companies at all. He's never received a cent from them. Of the two motions to dismiss that were fully litigated in front of Chief Judge Williamson in the bankruptcy court, he's the only defendant to be dismissed on 12b-6 on all of the claims. They do not allege he had ever heard of THI or THMI before any of this. They do not allege that he ever took any personal actions knowingly with regard to any of these companies. They either do shotgun pleading, where they just sort of say they throw him in with six other defendants and say they all did X, Y, or Z, or they say that these two men, Grunstein and Foreman, were his agents, and when Grunstein and Foreman transacted business for their own profit without his knowledge, they were acting as his agents, and he could somehow be held to account for that. This is why Chief Judge Williamson, who gave them two shots at pleading claims against Mr. Schroen, dismissed all of the claims. It's why Judge Kovacevic affirmed that dismissal on the Kovacevic? Kovacevic. Sorry. She didn't hear our argument, so it's all done on the papers. In any event, ultimately, given the way bankruptcy courts work, given that it's litigation on steroids, Mr. Schroen got a fine result getting out on 12b-6, but not before myself and my colleagues sat through 30 depositions in the case. Mr. Wilkes' firm and his co-plaintiffs deposed Mr. Schroen four times in this whole litigation. After all this litigation, the bankruptcy court actually ultimately did hold the trial with respect to some of the defendants. These folks wound up, including all the settlements that they got, with $24 million as a result of these proceedings. Immediately at the end of the proceedings, they said, okay, thank you. Can we now go back and sue Mr. Schroen in state court on the same theories? This is the context that Chief Judge Williamson memorably described as Groundhog Day. Let me ask you this. There are some cases in the circuit, and they all depend on their factual context, but some of them say that with regard to the Anti-Injunction Act, that at least in some scenarios, the better course for a district court or a bankruptcy court is to stay its hand and let a res judicata or collateral estoppel issue be litigated in the next forum where the next case gets filed. Why is this not one of those cases? Sure. So there's, as the Court knows, there's two bases under which, two exceptions to the Anti-Injunction Act under which these matters are litigated. One of them is about, essentially, is the res judicata example for the court to protect its judgments. The other one is in aid of its jurisdiction. Starting with the to protect its judgments, I would say, given some of the history that I've described much more in the briefs and in the 14 volumes of the excerpts of record, there has been litigation again and again. There was a preliminary injunction staying the proceedings in the bankruptcy court. These folks violated it. We had to go back to Chief Judge Williamson. He held them, you know, he held that they had violated the injunction, stopped that litigation again. They said, we're just going to keep going. We're going to pursue it again. After the bankruptcy court had just a giant case with 30 depositions, 300 pages of complaints, 16, 17 parties, the judge issued something like 20 published decisions in this case. This is the third appeal that this court has received in this, and we have several other appeals. Trone has two appeals. Others have several more appeals in the intermediate courts. It's entirely appropriate under these facts and consistent with the basis of protecting the judgment of the court to prevent the probate estates from willfully proceeding to state courts and hoping that they can argue, that they can hear. You're hearing what they will argue, of course. What are we up to now, by the way? This has got a lot of history. Judge Williams said 11 years of litigation, 27 lawsuits, 15 appeals, 13 different courts, 17 judges in five states. I think we've increased every one of those. What are we up to? I think that's right. You know, I haven't improved on that count. Since he said those words, Trone has been an appellee in three appeals, so we'd have to add that. He is ending it. One law firm, the Troutman Sanders law firm, was involved in continued litigation. Most folks, frankly. Some of them were found to have been involved in these deals, and the lion's share of the $24 million Grunstein Informants Company wound up settling with $18.5 million. The question was, why not just litigate this as race due to color? Part of your answer was to protect the court's judgment, but is the other part of your answer that's necessary in aid of the court's jurisdiction? What I understood your argument was is, in theory, you know, the money, they've got their settlement, and nobody's going to undo that settlement, maybe. I'm not clear on that, and you can help me on that in a minute. But I thought the bankruptcy judge's argument was, look, if they get a payday with Mr. Trone and get millions more dollars, that should have gone in the bankruptcy estate, and that money somehow was able, creditors weren't able to get it. Is that part of your position? Well, I think, I mean, certainly part of the interference with the bankruptcy proceeding, it's clearly inconsistent for them to pursue these collateral proceedings, which are directly attacking the jurisdiction of the bankruptcy court in the first place. That's what they would have to argue. You know, that's inconsistent. I think the main argument, as I understood it, was Chief Judge Williamson was faced with these settlements. He had this litigation, which had been in front of him for years, with all these parties, and they started to get to the settlements. And the key settlement was with these fundamental parties. Right. And the structure of the settlement was as follows. Once this all started and folks started to, once we started getting impleted and we realized that even though we had nothing to do with this, we could actually be facing substantial liability in the state courts on these nine-figure judgments, the impleted defendants entered a deal with the receiver for THI. THI was defunct. The Maryland Corporation, the way they made it, what they did is rather than putting it in bankruptcy, they created a receivership. Again, Tron had nothing to do with this. Learned all this after the fact. The 16 parties who were Mr. Wilkes' targets entered into a contract, a settlement agreement with the THI receiver. Right. Among other things, the fundamental parties who were most directly involved agreed to fund the defense of the THI receiver in these Florida actions. They assumed that defense. Mr. Schrone contributed $200,000 to the pool, and I think the other defendants kind of paid something like a million dollars, 1.1 in total. But the heart of it, the value that the receiver also was getting was to You're losing me a little bit with the weeds. Sure. The settlement contemplated that the fundamental parties would stand down and stop paying for the defense of THI. So the purpose of the settlement, in addition to them recovering this money, was to allow Mr. Wilkes to return to state court, ultimately obtain more undefended judgments in state courts, because they were in various stages. That's what I don't understand. I thought that the settlement was sort of contingent on the fact that this injunction would be issued, that that was part and parcel of it. Is that not accurate? It is not accurate that the settlement itself required the injunction. The original settlement contemplated an injunction from the bankruptcy court, and the bankruptcy court said, I can only issue this injunction, which would have been a bar order, if I'm also issuing the permanent injunction. And, in fact, you're not going to get any of the money under this settlement until the settlement is available. I'm not going to let Fundamental evade its obligations under this settlement agreement, allow these state court proceedings to go forward potentially undefended without protecting the other parties. It just wouldn't be fair and equitable. That was what the bankruptcy court said. These folks didn't like the notion of being barred from returning to state court and not being able to appeal. They wanted the money first. They went back with Fundamental, and they reworked the structure so that the settlement does not have a bar order anymore. What it does have is it has Mr. Wilkes' clients, the probate estates, indemnifying Fundamental for its breach of contract, essentially. So Fundamental will drop the defense of THI, won't fund it anymore, and the like. They'll have the opportunity for more windfall judgments in state court. Was that finalized, the modified settlement, timing-wise? Yes. After Judge Williamson's injunction? So what happened was first he issued the injunction in connection with the settlement for the bar order. He said, I approve this settlement. It's contingent upon the injunction. Here's the injunction. These guys didn't like it because they couldn't get the money until the injunction was final and non-appealable. They went back. They asked Judge Williamson to amend it, basically. And they said, we're not going to do that deal, Judge. We don't want to be able to. Did they get their money or didn't they get their money? At that time they didn't get their money until they came back and they said to Judge Williamson, we have a new settlement. We don't need a bar order from you. We still get our money, and now the probate estates will indemnify Fundamental, or FAS is the acronym for the particular company, for its breach of contract, for not defending these lawsuits. That's how they structured it. They said, Judge, will you please approve this settlement? Now, the question, though, is what was the final judgment that was appealed to Judge Kavakovich? That was the one after all this settlement had been modified or not? It was after it had been modified. And, you know, I'm happy to try to explain as best as I can. I think that the bankruptcy court's final opinion on the permanent injunction, which is in the record, it's in the 10th volume of the appendix, it's BK 893-1167. I think does a good job of explaining some of this. Our red brief to some degree does, although I'm happy to do it, but sometimes it's easier to read it. But ultimately what happened was the bankruptcy court said, okay, you have structured this in a way to try to protect FAS without a bar order because basically the probate estates will indemnify FAS. So I'm still going to issue the injunction because I still don't think this is basically the same thing. You're just trying to carefully craft the settlement to allow FAS to withdraw its defense. And then the other part of it was that the THI receiver had no money now. You're losing me. Sure. We're here on the appeal from the district court's order of September the 8th. Yes. And that order. And nothing has happened since then that would change the finality of this. That's my question. Yes, no, that's correct, Your Honor. That order of the district court affirmed a series of orders and opinions that the bankruptcy court issued. And so in the bankruptcy court's opinion on the permanent injunction, that which was before the district court, of course, that lays out some of this history in terms. We get back to Judge Jordan's question, though, which is why should Mr. Schrone not, going forward, just rely on basic res judicata principles as opposed to an injunction? What is the answer to that? The answer is that the law clearly gives a federal court the authority to issue a res judicata injunction, an anti-suit injunction like this. It's a recognized exception. And then I think it becomes a question of discretion of the bankruptcy court in this case as to whether this is the appropriate set of facts under which that discretion should be exercised. Is this a case in which you should just let somebody pursue res judicata or the facts of this case one in which it is fair and appropriate to issue? What about the point Mr. Wilkes made that the combination of the dismissal with prejudice and the injunction has the effect of prohibiting him from raising the fraud claim, which he did not know about at the time they filed the last operative part of the complaint? Well, Mr. Wilkes has sued Mr. Shrone six times. He's pursued him on 15 claims in the bankruptcy court. I heard civil RICO mentioned now. Number one, I think they've had ample time to do so. Number two, I think Judge Williamson would not have approved. He said he would not approve the settlement of this complex case if there was no injunction. Mr. Wilkes, as the court elucidated, is happy with the settlement that he received. Judge Williamson said he has to make sure if it's fair and equitable to third parties when it affects their rights. This was inviting breaches that would magnify the potential liability in state court for Mr. Shrone. He did not want to approve that in his discretion unless Mr. Shrone was protected. So what happens with that then? That's the judge's inclination if we came back and said, no, you can't enjoin these future lawsuits. What happens to the settlement? Does Judge Williamson have any ability to go back and say, oh, let's start all over again? How final are those? I mean, the money's been paid. I suppose Mr. Shrone could go and say, hey, they should get the money back. Mr. Wilkes is not going to complain. Mr. Shrone is the only party whose rights would be affected under those circumstances. And so it would be very difficult, I think, as a practical matter for Mr. Shrone. You're saying we should give some deference to what was a very important factor to the bankruptcy judge in approving it. I think so. I mean, the bankruptcy judge has been living with this case for years. And I think, I mean, we heard some of the tenor here. These claims are simply ridiculous. And I'm happy to talk about the merits of any of the claims. But the notion that Mr. Shrone defrauded someone is spurious, frankly. Let's go ahead and discuss that for a moment. So tell me why you think the bankruptcy judge and later the district court judge correctly dismissed with prejudice this complaint against and the claims against Mr. Shrone. Sure. So taking the with prejudice part first, and then I'm happy to discuss sort of the individual claims that they've appealed. There were 15 claims against Shrone. I think they appeal five or six of them here. But the with prejudice part was they had had 15 claims. They had had two opportunities to amend their complaint. Meanwhile, discovery had continued apace. When they filed the second amended complaint, they'd already deposed Mr. Shrone. They'd already obtained document discovery. By the time Judge Williamson got to the second amended complaint, he gave them one chance to amend. Summary judgment briefs were due in a month. The trial was three or four months away. This is a bankruptcy court. Things move fast. It was simply too late, and they'd had 300 pages of complaints and 1,000 or more allegations. I mean, this is a quintessential example of where a with prejudice dismissal was appropriate. They had had ample opportunity. They'd had generally when you file, there are times when you don't get to any discovery before you get to amend your complaint. They had pled all they could plead, and they still had no evidence that Mr. Shrone knew of these companies or had any involvement. All right, so let's talk about the factual allegations in that second amended complaint. So the key allegations, as far as I can tell, are that Mr. Shrone had some relationship with Grunstein and Foreman, and so that they were acting as his agents. Because there's no allegations that Mr. Shrone took any tortious actions at all kind of in the complaint. There's no specific facts of what he did. But the allegations of agency, ironically or otherwise, or unfortunately for Mr. Shrone, are taken from a New York lawsuit that Mr. Shrone filed against Grunstein and Foreman. It was a very large case. I tried it. I went to trial on it. This is a very small part of it. But one of his claims against Grunstein and Foreman was that they breached a fiduciary duty. And what did they do? They usurped a corporate opportunity. They knew of THI of Baltimore, not the defunct company, but one of these companies, because one was a lawyer for him and one was an investment banker, who did a deal for him in 2003. And having that relationship, they heard that THI of Baltimore was running into difficulties, and they wound up buying its assets in 2006, threatening it with what they suggested would be the rights of the landlord. But Shrone sued and said he didn't know about this. They did it on their own. There was no connection to him, and therefore they breached a fiduciary duty because they only had this corporate opportunity because of their relationship with him. Those are the allegations which are plopped in verbatim into this complaint. In other words, he said, I would have liked to know about the deal and gotten into it, but I didn't. Exactly. And so their complaint 11 times uses the word faithless servants, which both the bankruptcy court and the district court found to be probative because faithless servant is someone who's not working on behalf of his principal. So what does the complaint say that your client did? Well, basically it doesn't say my client did anything specifically. All it's saying is these two men, Grunstein and Foreman, bought these assets. There's no question about that. It's undisputed. They are the owner of the fundamental company. They're the ones who wound up paying $18.5 million in all of this. But Mr. Shrone didn't receive, wasn't part of this deal. The other thing they say is they point to a Shrone company, SWC. Their allegations were that the bad things Grunstein and the other fellow did were on behalf of your client. That was the allegation. They were his agents. But at the same time, with contradictory allegations that say they did this surreptitiously, which was, again, just drawn from our complaint, which is to say without his knowledge, for their own personal benefit as faithless servants. There is no allegation that Shrone received anything. So they contradict their own allegation by themselves alleging that they were faithless servants to Shrone. Exactly. I mean, sorry, they being the prorated states. Yes. And the bankruptcy court and the district court both took them at their word. I mean, the district court said she would have dismissed this under Rule 8. But the bankruptcy court, while recognizing that the complaint was complicated and convoluted, took it seriously and tried to give it its meaning into two separate opinions. The other argument they make concerns that a Shrone company, SWC, received a one-third option in this company fundamental. That's the allegation. On the face of it, if SWC received an option, Shrone didn't receive it. And there is no allegation of ownership. We're all talking about a complaint, aren't we? Aren't we talking about taking the allegations in the light most favorable to the complaint? Yes, but taking it in the light most favorable, it doesn't state a claim, as the bankruptcy court recognized twice and the district court recognizes as well. Even if you assume the truth of everything it said, it does not state a legal claim. So to allege a fraudulent conveyance, you need to show that assets were transferred from one company for less than reasonably equivalent value to the person who has it. Shrone didn't receive anything, and he's not alleged to have received anything. Because the option in this particular case, because the option wasn't exercised? Right. There was never any – well, yes and no. I mean, number one, the assets are always with fundamental, the company, which they sued. Any assets that fundamental fraudulently obtained is with fundamental. Basic forms of corporate – even if Mr. Shrone were an upper-tier shareholder, it doesn't follow if he never received any benefit from fundamental that he has received any fraudulent conveyance. And he doesn't – he never received anything. He didn't even personally hold the option. It's a company, which he doesn't even own. His kids own. But it is impossible to suggest that Mr. Shrone has any assets that properly belong to THI or THMI. There are just no allegations of it, and what they do is they throw a lot of stuff on the wall, and they hope that in this complicated factual pattern, there might be something there. I mean, that is why three judges now, Judge Mary Day, Judge Williamson, and Judge – Kovacevic. Thank you. All recognize that there are serious Rule 8 problems with this pleading because, I mean, as we've heard this morning, things get shifted around very quickly kind of in this world here. And there are just no allegations on any of these claims. And, again, we were the only defendant who was dismissed in his entirety on 12b-6. There is a reason for it. Judge Williamson was not in a hurry to get rid of these claims that the plaintiffs had brought. He ultimately tried a number of claims against six or seven defendants. But if you just look, there's not a single one of the causes of action that, even taking them as true, state a claim under the law, which is precisely what 12b-6 is. That circles back to you saying that it should be with prejudice because they had years to get their complaints in shape where it wouldn't be dismissed and they failed to do so. Yes. This was the fourth complaint that they asserted against Schroen or fifth or sixth or something like that. And in this litigation, it was the third. So trial was three or four months away. This was time for prejudice dismissal. Let me ask you about the jurisdiction. In your brief, you say the probates of state real complaint is not with the bankruptcy court's jurisdiction or authority, but Mr. Wilkes just argued that he says it is a jurisdictional issue. What are you saying here? Yeah, well, I mean, I'll try to unpack it because some of the arguments that Mr. Wilkes was making were not, at least as I understood it, kind of in the brief. I heard a question about whether the bankruptcy court originally had related to jurisdiction. He made that argument for the bankruptcy court and the district court. I don't really see that in his brief. I understand it's subject matter jurisdiction, and if this court, which is considered, obviously, it's obliged to do so. I think on the facts here and the law, I'm happy to go into it. There is clearly subject matter jurisdiction. They wound up with the $24 million. I would note that this court in the Townsend v. Schroen case, which I think we sent a 28-J letter for, recognized in affirming the denial of mandamus to the bankruptcy court that jurisdiction is at least arguable. In other words, it's, well, mandamus, you don't reach the merits, found that the district court acted in its discretion in denying mandamus because, in fact, the bankruptcy court had jurisdiction. Again, I'm over my time, but I'm happy to go there. The other one, I've heard a stern claim on this. Again, the stern claim is not really raised in the brief. I mean, the short answer is, as the Supreme Court noted in Sharif, parties can consent to the bankruptcy court's authority. It's not even a jurisdictional matter. It's the authority to enter a final judgment. These guys are the plaintiffs. They brought the case. They alleged jurisdiction in all of their complaints. They actually discussed it in open court, and there are sort of record sites, you know, to that effect, that they had consented, that they believed this case was related to. They're not giving any of the money back. I think, as Judge Jordan mentioned, the shoe on the other foot. They wouldn't be arguing. They wouldn't be confessing error on jurisdiction here, you know, on the stern issue. So the stern issue is both—actually, it's waived, and there's clearly consent in the record since we're talking about the plaintiffs. On the subject matter jurisdiction, you know, cases like Pacor and the like recognize that the bankruptcy's jurisdiction for matters that could conceivably affect the estate is rather broad. Clearly satisfied here where, you know, these guys were trying to capture the assets, you know, that would go to the debtor. In fact, got $24 million, argued that THI, THMI, and the debtor were all alter egos of each other, and at least two of those were substantively consolidated ultimately. So jurisdiction being determined at the start of it, clearly that was related to jurisdiction here. All right, Mr. Engel. Thank you very much. Thank you. Can I please score it? Yeah. I want to go backwards. First, we would raise jurisdiction any time I think there's not subject matter jurisdiction, I'm going to raise it. I don't care what it costs. Are you going to give the $24 million back? That's my obligation. I have to. I don't have a problem with it because the money passed outside the estate. There was an agreement. We did not believe this money belonged to the estate. The first settlement almost blew up because the trustee wanted to take all the money, and it took about a year to work out. The trustee was paid almost $8 million, and it was not $24 million. It was only, I think, $16 million originally. Perhaps $19 million was paid. We had almost $6 million in costs in the case that we had to pay. Our fee was less than $2 million. It's at this point with collection about $2.4 million total in the whole case. So this is not a money case for us. I've been in it 13 years in six cases, and you've counted the number of appeals. This court said in Jackson versus- So you want to unwind everything? Say again? You want to unwind everything? No. We don't need to because the settlements clearly anticipated jurisdiction. How can you- We anticipated that we were settling. We settled these and had them approved by the state courts and the Maryland Receiver Court. Each settlement had to be approved individually outside of the bankruptcy, and half of the money, actually the GE money, the GTCR, and the Ventas money, that actually didn't even go through the estate. Mr. Wilk, let me turn you to the claims against Mr. Schron, if you could. Yes. In a paragraph, summarize for me what the facts are that you allege that puts Mr. Schron on the hook for any of your claims, the ones that you are raising on appeal. What do you allege that he did creates legal liability? We allege that Mr. Schron had a longstanding relationship with Leonard Grunstein. Leonard Grunstein's law firm was representing IHS in bankruptcy. There was a stalking horse bidder that came from the directors of the IHS liquidating company. That was announced as a closed sale. Within three days, it was announced a new company called A. Briarwood had taken over and was now purchasing the company. We investigated and we determined A. Briarwood to be a company that was an asset of Mr. Schron's. We allege in our complaint that Mr. Schron went and met with Anthony Misitano, who was the supposed operating officer president of the companies. If you read the complaint, I mean, everybody makes fun of how long the complaint was. This occurred over decades. But we allege that Mr. Schron, with Mr. Grunstein, made a decision to take these companies, take the assets, not put any money up, securitize them, create a prop co-op co-model and an oil co-op where you leave the assets in an oil company. You use the prop co-op and the op co-op. Mr. Schron took an equity interest. His lawyers tried to get him out of it. Wait, wait, wait. How did he take an equity interest? He owned an option for the entirety of management of Mariner. Of what company? Mariner. Which is Mariner? SMV, the company he was talking about a few minutes ago. I can't keep this together. There were two nursing home companies. Yes. And everything you're saying is in the complaint. What we want to know is what's in the complaint. That's what he just argued to you. He said that we allege that there was a commercial mortgage-backed security that was originally $820 million. It's been refinanced several times now. But it was originally $820 million, which Ruben Schron personally sponsored, that he was going to make about $800 million net up front, and that the operations would go initially to Grunstein and Foreman. But he had an option for which he claimed he paid $100 million, was an equity interest, and that's what Mr. Engel sued, and it was in a closed suit. It was sealed court. But if you read the opinion of the court, Judge Sherwood, he describes exactly what I'm describing to you, that Mr. Schron funded this. Mr. Schron put the money in. He owned the interest, that he used the fundamental properties. Then he combined them together, and then Judge Sherwood cites to the suit where Mr. Schron also sued Grunstein and Fundamental, and this was his allegation. And we alleged that he had these people create the company to strip the assets out, Fundamental, and rob THI. He didn't get his share. The benefit to him is about $2 billion that we know of now. It's hard to tell the actual value. We're dealing with 12B6, and we're talking about the complaint. Then we also heard that there was lots of depositions. And if this were converted to a summary judgment, is that where we're dealing here, where the deposition, the evidence? No? First of all, everybody keeps – the problem is this. It's the 12B6. It's not only is it plausible, it happened. He sued. He won the lawsuit. Mr. Schron sued. Mr. Engel handled the suit. Which suit? The suit against? Against Fundamental, against Grunstein and Informant, saying they were his agents and they were faithless, and he was entitled to the proceeds rather than them. If they rob a bank for him in his name, he doesn't get to keep the money. Of the other entity, the one in Baltimore, is that correct or no? No, of the Fundamental THI. Fundamental and THI was a – they're the same. They just renamed them. Judge Williamson finds that in his findings, and it's in our record as well, that it was originally THI, THI Baltimore, THI Baltimore Management. Then it became known as FAS. Then it became known as FCC. Then it became known as FAS again, and now it's become known as FCC. But the other companies were named Fletch, F-L-T-C-H Holdings. Mr. Schron sued, and he won one-third on appeal, twice. He won a Fletch, and he won all of Mariner's operating companies. They then settled, and we were enjoined from taking any actions. We asked Judge Williamson to enjoin that action. If you look in the record, February 2014, we asked the judge to let us have that discovery because we wanted to know what they were settling, how much Mr. Schron was making. He said, my order is very narrow. I made a scrivener's error in the preliminary injunction. When I said no action may proceed, he said what I meant was no legal proceeding, not a settlement in their case. Now, we weren't the only creditor. There was another creditor that had a million-dollar claim here. This was directed solely at my firm and my clients. It was directed at me. And I argue facts all the time. Mr. Schron has not accepted Judge Williamson's jurisdiction. In his motion to dismiss, he said we do not admit personal jurisdiction. He has denied personal jurisdiction in the Nunziata case. They were remanded to trial court for determination on personal jurisdiction. That's not been adjudicated. Personal jurisdiction is different than subject matter jurisdiction, though. It is. But Mr. Schron has always kept his options. Even if he had lost, if Judge Williamson had let this case go forward, he could have then argued Judge Williamson should have given him his argument on personal jurisdiction. Of course. Every lawyer keeps options open. You've got a lot of options open, at least you thought you had, and so do they. That's the way the litigation goes. Your Honor, I've had no control of this case. We filed this and got first in front of Judge Williamson in February 2012. By September, everybody talks of the decade I had against Mr. Schron. We could never get past jurisdictional depositions with Mr. Schron. By February, we knew little. By September of 2013, when we had to file the complaint, we knew little. Fundamental had all the records. Judge Williamson sanctioned them and found all inferences were going against them for not giving us discovery. You've already deposed Mr. Schron four times. Those depositions were always limited. To what? To jurisdiction? To personal jurisdiction? Say again? Those depositions were limited to personal jurisdiction only? Yes, and he instructed not to answer on almost every instance. Why did you have to do it? The trustee was allowed to ask questions, I think. Why did you have to depose him four times on personal jurisdiction only? Well, I think you're talking nationally since the beginning of time because it's not in this case. He's referring to four times. I'm asking you, Mr. Wilkes. In this case, I don't know of but one deposition.  All right, Mr. Wilkes, thank you. I think he's referring to a category of cases that have nothing to do with this. All right, we thank you both very much for the arguments and we'll take a close look. We're in recess. Thank you very much. All right.